**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**

| | |
|---|---|
| U.S. SECURITIES AND EXCHANGE COMMISSION, )<br><br>Plaintiff, )<br><br>v. )<br><br>DR. JOSEPH J. NANTOMAH, INVESTORS CAPITAL LLC, GLOBAL INVESTORS CAPITAL LLC, and HIGH INCOME PERFORMANCE PARTNERS LLC, )<br><br>Defendants. ) | Civil Action No.<br><br>COMPLAINT<br><br>JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiff U.S. Securities and Exchange Commission ("SEC"), for its complaint against Dr. Joseph J. Nantomah ("Nantomah"), Investors Capital LLC ("Investors Capital"), Global Investors Capital LLC ("Global Investors Capital"), and High Income Performance Partners LLC ("High Income Performance Partners") (together, "Defendants"), alleges as follows:

## NATURE OF THE CASE

1.      This matter concerns a real estate-related offering fraud perpetrated by Nantomah through three Wisconsin limited liability companies he owned and controlled.

2.      From approximately May 2020 through at least January 2024 (the "Relevant Time Period"), Defendants solicited investors by promising to purchase, fix, and flip real estate for profit. Defendants collectively raised at least $1.9 million from at least 30 investors throughout the United States, including at least nine investors in Wisconsin. Unbeknownst to investors, many of whom were members of the Nigerian-American community, Nantomah misused their money by spending at least 80% of it on himself and his other ventures, and not on the promised real estate transactions.

3.     Nantomah held himself out as an "Incredibly Successful Entrepreneur" who amassed a multi-million dollar real estate portfolio after emigrating from Africa to Wisconsin in 2016 "with just $4,700," to become a "notable and sought after millionaire investor" who serves as a speaker, life coach, mentor, consultant, and philanthropist.  Nantomah made these and similar representations on his website, on social media sites, during presentations to potential investors, and during financial coaching seminars.

4.     Nantomah's story was misleading.  According to Nantomah, he had sufficient assets when he emigrated to America to support himself and his family without needing to work.  Likewise, Nantomah's claims on his website in 2024 that he owned "real estate assets currently valued at over $23 million," were also untrue.  According to public records searches, during the Relevant Time Period, Nantomah and the entities he controlled—including Defendants Investors Capital, Global Investors Capital, and High Income Performance Partners (together, the "Entity Defendants,")—owned only 11 properties with a collective value of approximately $1 million.

5.     Nantomah further enticed investors with promises of lucrative returns on investments (or "ROI") in a year or less.  Defendants promised different investors a variety of different ROI, typically in the range of 10% to 30%, but at times higher.  Defendants usually promised to make a payment to investors within three to 12 months consisting of the ROI and the return of their principal investment.

6.     Defendants usually entered into written investment agreements with investors making their first investment.  The agreements typically stated that the relevant Entity Defendant would provide services including purchasing, fixing, and flipping properties on behalf of investors and "acquir[ing] investment property that befits the investment fund."  Defendants told investors that profits would be generated through Nantomah's investment of their funds in either a specific

property or in unspecified real estate to be purchased, renovated, and sold. Some investors subsequently entered into verbal agreements with Nantomah and one or more of the Entity Defendants for additional real estate investments, subject to terms similar to the terms of their initial investments.

7.      Regardless of whether the investment agreements were written or verbal, Nantomah told investors that the money they invested was to be used for real estate development projects with repayment of their investment principal and ROI by a specified time.

8.      Despite these core representations and promises, Defendants spent only a small fraction (less than one-fifth) of the investors' money on purchasing or renovating real estate. Instead, Nantomah commingled investor funds in his personal bank accounts and accounts for the Entity Defendants and his other businesses, and often used the investors' funds for other purposes, including paying his personal living expenses, buying jewelry and automobiles, and paying for travel and entertainment.

9.      Although the written investment agreements identified at least 10 specific properties that Defendants were going to purchase, fix, and flip, public records show that during the Relevant Time Period, seven of those 10 properties were never owned by Defendants and, of the three properties that were acquired by Nantomah or a company he controlled, two were subject to foreclosure proceedings.

10.     Defendants have not paid most investors as promised in the written and verbal investment agreements. Investors who contacted Nantomah seeking repayment of their investment principal and ROI when their investment period ended were met with a series of excuses and delays.

11.     In addition, several of the investors sued Nantomah and/or the Entity Defendants when the Defendants failed to meet their payment obligations. Despite these lawsuits, Defendants

nonetheless continued to solicit funds for additional "successful investments" without disclosing that Defendants had not repaid prior investors.

12.     Based on the conduct described herein, Defendants violated the federal securities laws, namely Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933 ("Securities Act") and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder.

13.     There is a reasonable likelihood that, unless restrained and enjoined, Defendants will continue to violate these federal securities laws.

14.     Accordingly, the SEC seeks a judgment against Defendants that: (a) imposes permanent injunctive relief, including prohibiting Nantomah from again offering or selling securities; (b) orders disgorgement of ill-gotten gains plus prejudgment interest; and (c) imposes civil monetary penalties.

## JURISDICTION AND VENUE

15.     The SEC brings this action under Securities Act Section 20(b) [15 U.S.C. § 77t(b)] and Exchange Act Sections 21(d) and (e) [15 U.S.C. §§ 78u(d) and 78u(e)].

16.     This Court has jurisdiction over this action pursuant to Section 22 of the Securities Act [15 U.S.C. § 77v] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

17.     Venue is proper in this Court pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].  Many of the acts, practices, and courses of business constituting the violations alleged herein have occurred within this District.  Nantomah resided in this District during the Relevant Time Period, and the Entity Defendants and at least nine of Defendants' investor-victims are located in this District.

4

18.     Defendants directly and indirectly made use of the means and instrumentalities of interstate commerce and of the mails in connection with the acts, practices, and courses of business alleged herein, and will continue to do so unless enjoined.

**DEFENDANTS**

19.     **Dr. Joseph J. Nantomah**, formerly known as Joseph James Nantomah, age 48, was a resident of Milwaukee, Wisconsin during the Relevant Time Period.

20.     **Investors Capital LLC** is a Wisconsin limited liability company formed in March 2020 by Nantomah with its principal place of business in Milwaukee.  Investors Capital is owned and controlled by Nantomah.  It purports to engage in the business of real estate investment and management services.

21.     **Global Investors Capital LLC** is a Wisconsin limited liability company formed in March 2022 by Nantomah with its principal place of business in Milwaukee.  Global Investors Capital is owned and controlled by Nantomah.  It purports to engage in the business of real estate investments and management services.

22.     **High Income Performance Partners LLC** is a Wisconsin limited liability company formed in July 2023 by Nantomah with its principal place of business in Milwaukee.  High Income Performance Partners is owned and controlled by Nantomah.  It purports to engage in the business of providing coaching, real estate investments, and management services.

**ALLEGATIONS OF FACT**

I.     **OVERVIEW OF DEFENDANTS' AGREEMENTS REGARDING PURPORTED REAL ESTATE INVESTMENTS**

23.     From May 2020 through at least January 2024, at least 30 investors invested at least $1.9 million with Defendants.

24.     Nantomah communicated with the investors, and he negotiated, controlled the contents of, and signed the investment agreements on behalf of the Entity Defendants.

25.     All of the investment agreements contained similar terms regarding the services that Defendants would provide regardless of whether the agreement was with Investors Capital, Global Investors, or High Income Performance Partners.  These services typically included acquiring, funding, developing, leasing and purchasing properties on behalf of investors. The investment agreements also typically stated that the Entity Defendants would employ the highest professional standards, ethics, competence, integrity, and diligence throughout the course of the assignment.

26.     Though the details of the investment agreements changed from investor to investor, the Defendants typically offered and sold securities by promising to use investor money to source, inspect, and acquire prospective property "that befits the investment fund."  The agreements also included the amount of the investment, the amount of promised ROI, and the date by which the investor would be repaid a total amount consisting of the original investment plus the ROI.

27.     Some of the investment agreements stated the specific address of the property to be purchased and/or renovated.  Other agreements were silent as to the actual property to be purchased, instead including a generic statement that the relevant Entity Defendant was seeking investors "interested in real estate properties in Wisconsin/USA."

28.     The ROI rate and timing for repayment varied based on each investor's communications with Nantomah and were not the result of investing with a particular Entity Defendant or investing a particular amount of money.

29.     There was no requirement that investors participate in the selection or renovation of a property to obtain a return on their investment.  According to the investment agreements, Defendants were responsible for purchasing, fixing, and flipping the properties.

30.     The investment agreements did not specify any fees or profits owed to the Defendants in return for their services.

31.     Nantomah used WhatsApp messaging to solicit some of the investors who previously had made an initial investment with one of the Entity Defendants to participate in additional real estate investment opportunities.  As a result, some investors entered into verbal agreements with Nantomah for additional real estate investments.

32.     Regardless of whether the investment agreement was written or verbal, Nantomah told investors that the money they invested with the Entity Defendants would be used for real estate development projects with a repayment of their investment principal and the promised ROI within a specified time, usually less than 12 months.  Defendants did not disclose, and investors did not agree, that their money would be used for any other purpose.

33.     Nantomah controlled the finances of the Entity Defendants, including how investor funds were used and which properties to buy or sell.  Nantomah had sole control over all of the Defendants' bank accounts, except for one account in the name of Investors Capital for which his minor daughter was also listed as a signatory along with Nantomah.

34.     Defendants transferred funds they received from investors to at least 22 bank accounts controlled by Nantomah, who in turn commingled the investors' money with funds from his other businesses and his personal accounts.  Nantomah then used a portion of those commingled funds on real estate purchases and developments.  At least some investors

understood that that their money would be pooled with money from other investors to purchase and renovate real estate.

35. Defendants' investment offerings constitute investment contracts and are, therefore, "securities" as the term is defined in the Securities Act and the Exchange Act. For each investment agreement, there was (a) an investment of money, (b) in a common enterprise, (c) based on the expectation of profits to be derived from the efforts of Nantomah and the Entity Defendants.

36. None of the securities or securities offerings described herein was registered with the SEC, nor did they qualify for any exemptions under the federal securities laws.

## II. NANTOMAH USED A FALSE SALES PITCH FOR HIS UNREGISTERED REAL ESTATE INVESTMENTS

### A. Nantomah Falsely Marketed Himself as a Successful Real Estate Mogul.

37. Nantomah held himself out as a mentor and life coach, offering advice on building wealth and investing in real estate. Beginning in the spring of 2020, Nantomah started promoting real estate investment opportunities on his website, during financial "bootcamps" and seminars, and through various social media accounts including Instagram, Facebook, and LinkedIn.

38. Nantomah targeted investors in the Nigerian-American community. To that end, Nantomah promoted his real estate business through appearances as a guest speaker on a YouTube show that discussed issues of interest to the Nigerian-American community. Nantomah met additional investors through his participation in services at a church in Milwaukee and by delivering an investment presentation at the church to members of the congregation.

39. After hearing Nantomah speak at these events, a number of investors started following Nantomah's social media accounts, where he promoted his real estate investment opportunities to the public on an ongoing basis. For example, on June 12, 2022, Nantomah posted a real estate investment opportunity with Investors Capital on one his of social media accounts

8

encouraging investors to "invest in our real estate portfolio worth over $20,000,000 and get value for your money." In that same post, Nantomah also stated "Investment is the only guaranteed way to becoming successful, investment in real estate is the fastest way to becoming wealthy. . . . Take actions! Co [sic] invest with us today." Nantomah included telephone and email contact information for Investors Capital in the post.

40.     To entice investors, Nantomah held himself out as a successful real estate investor and "Serial Entrepreneur." On his website, Nantomah promoted himself as "a notable and sought-after millionaire investor from Africa." Among other superlatives, Nantomah's website further described him as an "Incredibly Successful Entrepreneur," "[a] brilliant, highly sought-after international speaker, coach, and consultant," and a recipient of "awards and accolades" and "worldwide" recognition for leadership and service.

41.     Nantomah also claimed on his website that in 2016 he "emigrated from Africa to Wisconsin in the United States with just $4,700," and "built real estate assets currently valued at over $23 million[,] which continues to grow."

42.     He repeated this same story on social media, during his financial coaching seminars, and during other presentations to potential investors.

43.     Nantomah's story was, at best, misleading. Nantomah testified under oath in September 2024 that he "was very rich in Nigeria" and "had enough money to take care of myself and my family" when he arrived in America in 2016. Similarly, Nantomah claimed on his website in 2024 to have "real estate assets currently valued at over $23 million." In reality, according to public records searches, during the Relevant Time Period Nantomah, the Entity Defendants, and other entities controlled by Nantomah owned only 11 properties. The collective value of those 11 properties, based on the most recent available purchase or sale price, was approximately $1 million.

**B.**   **Nantomah Offered Fraudulent, Unregistered Real Estate Investments Through Each of the Entity Defendants.**

44.    At least as early as May of 2020, Nantomah began promoting real estate investment opportunities, first through Investors Capital and eventually also through Global Investors Capital and High Income Performance Partners.

**1.**   **Investors Capital.**

45.    The majority of the investment agreements Nantomah entered into with investors were through Investors Capital.  Between May 2020 through at least June 2023, Investors Capital raised at least $1.7 million from at least 29 investors, with at least nine investors residing in Wisconsin and the remaining investors residing in at least six other states.

46.    Nantomah promoted investment opportunities with Investors Capital to the general public on his website and on his social media platforms.  Nantomah's website included statements about Investors Capital such as "we are actively seeking new properties that meet our high standards and new investors to join our community."  Nantomah posted on his social media accounts about current investment opportunities and congratulated Investors Capital investors on their purported success in prior deals, including the supposed purchase of a $10 million multi-unit apartment building in Wisconsin.

47.    On Nantomah's website, Investors Capital is described as "a private real estate investment group providing accredited investors with attractive investment opportunities." According to the website, Investors Capital has "a portfolio of many apartment units" and "most of our investments are between $10 million and $30 million, primarily in the Western United States."

48.    These statements were false.  According to public records searches, Investors Capital's real estate holdings were limited to a handful of modest residential properties located in

Wisconsin, none of which cost more than $250,000.  The total value of Investors Capital's real estate holdings never exceeded $1 million, let alone $10 to $30 million.

49.     Although Nantomah claimed that Investors Capital was open only to accredited investors, Defendants did not take any reasonable steps to verify investors' accredited status.  For example, Defendants did not ask investors to complete forms self-verifying their accredited status.  At least some of the investors in Investors Capital were not accredited.

50.     The investors, many of whom were not familiar with real estate investing, were not required to participate in the selection, improvement, or sale of the real estate.  Investors instead relied on the purported expertise of the Defendants to generate profits.

51.     Nantomah and Investors Capital typically entered into written agreements with most investors titled "Investment Agreement."  In these agreements, Nantomah and Investors Capital typically promised investors returns between 10% and 30%, to be derived from purchasing, fixing, and flipping real estate properties.  They promised to deliver these returns in a set amount of time, usually ranging from three months to 12 months.

52.     For example, Investor A signed an investment agreement in or around June 2023.  In the investment agreement:

       a.    Investors Capital pledged to "source, inspect, acquire, [sic] prospective property on behalf of the investor to acquire investment property that befits the investment fund."

       b.    Investor A agreed to invest "$80,000.00 only for the fixing and flip" of a specific property located in Slinger, Wisconsin.

       c.    Investors Capital promised to provide a ROI of 20% ($16,000) for a total repayment of $96,000 within eight months.

53.     Some of the investment agreements, like the agreement described above, referenced a specific property in which Nantomah and Investors Capital claimed they would invest the specific investor's funds.  Other investment agreements simply stated the property would be located in Wisconsin.  Still other investment agreements were silent as to the specific property.

54.     Some investments were never memorialized with a written investment agreement and instead were reached during verbal discussions with Nantomah.  However, all investors in Investors Capital, regardless of whether they received a written investment agreement or not, were told by Nantomah that their funds would be used for the purchase and development of real estate.

55.     Defendants never disclosed, and the investors did not consent to, investor funds being used for any purpose other than the purchasing, fixing, and flipping of real estate properties.

56.     On more than one occasion, Nantomah and Investors Capital listed a property in an investor's investment agreement that they never actually owned during the Relevant Time Period.

57.     For example, pursuant to their agreements with Investors Capital, Investor A and Investor B invested a total of $180,000 to fix and flip a property in Slinger, Wisconsin.  Investor A's investment agreement is described in Paragraph 52 above.  Investor B's investment agreement was dated May 29, 2022 and called for Investor B to contribute $100,000 "only for the fixing and flip" of the property in Slinger, Wisconsin, and for Investors Capital to pay Investor B a ROI of $10,000 in 8 months for a total repayment of $110,000.  But, according to public records searches, Defendants never purchased that property during the Relevant Time Period.  Although the 8-month period of both investor agreements has long since passed, as of March 2025, Investor A has not received any money back from any Defendant, and Investor B has only received $33,000, less than one-third of the amount that Nantomah and Investors Capital promised Investor B in connection with this investment.

### 2. Global Investors Capital and High Income Performance Partners.

58. Later in the scheme, Nantomah also solicited investments through two of his other entities. Between June 2023 and September 2023, at least two investors, one residing in Georgia and one residing in New York, cumulatively invested at least $65,000 in Global Investors Capital. Between July 2023 and January 2024, at least three investors, one residing in Ohio and two residing in Texas, cumulatively invested at least $106,000 in High Income Performance Partners.

59. Nantomah's website included information about Global Investors Capital on the same page as the information about Investors Capital. On social media, Nantomah solicited investors to "join [Global Investors Capital] as we invest in paradise" in Tulum, Mexico and shared a video congratulating "all our investors and Partners with Global Investors Capital" for a purported $250,000 investment in the Cayman Islands.

60. Nantomah promoted High Income Performance Partners on his website, sharing links to register "to gain invaluable insights in the art of finding the perfect partners and mastering the art of negotiating deals that are not just beneficial but highly profitable." Separately, Nantomah advertised High Income Performance Partners on social media as being "designed specifically for individuals like you with a high earning potential who are looking to expand their income streams and take their financial success to new heights." Nantomah claimed on social media that High Income Performance Partners' training sessions provided opportunities to "network, invest, mentorship, get funding, learn & earn" with the potential to be a "Millionaire in 1 Year." Interested individuals could sign up for High Income Performance Partners on Nantomah's personal website or by emailing him directly.

61. Nantomah entered into the investment agreements on behalf of Global Investors Capital and High Income Performance Partners. Some of the investments in Global Investors Capital and High Income Performance Partners were documented in written investment agreements,

but at least one investor entered into verbal agreements with High Income Performance Partners. These investment agreements were similar to the investment agreements for Investors Capital: Nantomah and the relevant Entity Defendant told investors that their funds would be invested in real estate holdings, and their returns would be derived from the performance of those real estate investments. Nantomah promised ROI in specific dollar amounts within three to 12 months.

62.     For example, in or about September 2023, Investor A entered into an investment agreement with Global Investors Capital pursuant to which:

    a.  Global Investors Capital pledged to "source, inspect, acquire, [sic] prospective property on behalf of the investor to acquire investment property that befits the investment fund."

    b.  Investor A agreed to invest "$45,000.00 only for the fixing and flip" of a specific property located in Milwaukee.

    c.  Global Investors Capital promised to provide a ROI of $32,000, for a total repayment of $77,000, within seven months.

63.     In or about January 2024, Investor C entered into an investment agreement with High Income Performance Partners pursuant to which:

    a.  High Income Performance Partners pledged to "source, inspect, acquire, [sic] prospective property on behalf of the partners, investors to acquire investment property that befits the investment fund."

    b.  Investor C agreed to invest "$10,000.00 only for the land purchase / fixing and flip of properties."

    c.  The investment agreement did not specify a property.

d.  High Income Performance Partners promised to provide a ROI of $2,000, for a total repayment of $12,000, within three months.

**C.  Defendants Misused Investor Funds.**

64.  Defendants did not segregate investors' funds into different accounts based on which company they invested with or which property they had supposedly invested in.  Instead, Nantomah transferred investor funds into at least 22 bank accounts he controlled, where he commingled those funds with money from Nantomah's other businesses and his personal accounts.

65.  Contrary to Defendants' representations that investor money would be used only to purchase, fix, and flip properties, Defendants misused substantial portions of the investors' funds.  Only about 15% of the at least $1.9 million obtained from investors was used to purchase or renovate real estate.

66.  The majority of the funds Defendants received from investors were used for other purposes, such as Nantomah's personal expenses.  These personal expenses included credit card payments, jewelry, automobiles, travel, and entertainment.

67.  Defendants never told investors that their funds would be used to pay for Nantomah's personal uses or for anything other than purchasing, fixing, and flipping real estate properties.

68.  Furthermore, Defendants did not buy many of the properties that were listed in the investment agreements as the properties Defendants would purchase, fix, and flip to generate returns for investors.  The written investment agreements identified at least 10 specific properties.  However, public record searches indicate that seven of those 10 properties were not owned by Nantomah, the Entity Defendants, or the other companies Nantomah controlled during the Relevant Time Period.

69.     Moreover, of the three identified properties that Defendants did own, two were subject to foreclosure proceedings. As of May 2025, one of the foreclosed properties has not been sold. The other foreclosed property sold for a profit of approximately $13,000. The third property identified in the written investment agreements sold for a profit of $50,000. That amount was sufficient to pay the $28,500 ROI owed to two investors for their investments in that specific property, but insufficient to repay their principal investments of $115,000 collectively or to repay all of the other investors whose investment agreements referenced properties that were never bought, never sold, or were subject to foreclosure proceedings.

70.     The few properties Nantomah or his companies did purchase did not generate enough profits to pay the ROI and principal promised to investors. Based on public records searches, since February 2020, Nantomah and entities he controls have purchased only 11 properties. Of those 11 properties, five were obtained for a total purchase price of $135,500 and continue to be held by one of Nantomah's companies. The other six properties that Nantomah or his companies purchased and then sold during the Relevant Time Period generated a total profit of approximately $200,000, an amount substantially less than the approximately $500,000 collectively owed to investors between May 2021 through July 2024 to cover the ROI owed on their original investments, and not including repayment of the at least $1.9 million in principal investors provided to the Defendants. Furthermore, since June 2022, at least six of the 11 properties that were or are owned by Nantomah and his companies have been subject to foreclosure proceedings.

71.     Defendants knew, or were reckless in not knowing, that they were not using investor money as promised and that Defendants' real estate investment business had not generated the returns promised in the investment agreements. Nonetheless, Defendants

continued to raise money from investors, even while knowing that they were unable to pay the promised returns from their limited and unprofitable real estate investments.

**D.    When the Time Came to Repay Investors, Nantomah Lulled or Threatened Investors to Perpetuate His Fraudulent Scheme.**

72.    Collectively, for the at least 30 investors who invested at least $1.9 million, Defendants promised approximately $2.5 million in total repayments, consisting of a repayment of their principal investment amounts plus the ROI.  While at least eight investors were repaid a total of $179,400 in satisfaction of the terms of their investment agreements, and some other investors have received payments of various amounts, most investors have not received the return of their principal or the promised profits.  As of March 2025, the total amount Defendants paid to investors, including the $179,400 of repayments in full, is only approximately $591,000.

73.    When contacted by investors demanding repayment under their investment agreements, Nantomah lulled investors with excuses for missed payments, including blaming "the bank" for delays.  For example, Nantomah told some of the investors: he changed his bank account which caused a delay in making payment; his bank account containing the requisite funds was closed because he was doing too many transactions; and/or he had authorized the release of funds but the bank was not fulfilling his request.

74.    After being confronted by certain aggrieved investors, Nantomah threatened certain complaining investors with legal action.

75.    Eventually, Nantomah stopped responding to investors' calls and outreach on social media and blocked investors from contacting him on WhatsApp, even if it was the only way they had to communicate with him.

76.    Consequently, between 2022 and 2025, certain investors filed at least two dozen civil lawsuits against Nantomah in an effort to recoup their losses.

77.     When soliciting investors, Defendants never disclosed that they were unable to repay previous investors as required by the terms of their investment agreements, or that Defendants had been sued for failing to repay investors.

**E.     This Action Is Timely Filed.**

78.     The misconduct at issue in this Complaint occurred between approximately May 2020 and January 2024.

79.     Nantomah and Investors Capital entered into agreements with the SEC in which they agreed to toll any statute of limitations applicable to the conduct and claims alleged herein during the period between January 14, 2025 and April 14, 2025.

## COUNT I

**Violations of Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5**
**(Against All Defendants)**

80.     Paragraphs 1 through 79 are realleged and incorporated by reference.

81.     Defendants, in connection with the purchase and sale of securities, by the use of the means and instrumentalities of interstate commerce and by the use of the mails, directly and indirectly used and employed devices, schemes and artifices to defraud; made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and engaged in acts, practices and courses of business which operated or would have operated as a fraud and deceit upon purchasers and prospective purchasers of securities.

82.     Defendants each acted with scienter in that they knowingly or recklessly made the material misrepresentations and omissions and engaged in the fraudulent scheme identified above.

83.     By reason of the foregoing, Defendants violated, and unless restrained and enjoined, are reasonably likely to continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## COUNT II

### Violations of Section 17(a) of the Securities Act
### (Against All Defendants)

84.     Paragraphs 1 through 79 are realleged and incorporated by reference as though fully set forth herein.

85.     By engaging in the conduct described above, Defendants, in the offer and sale of securities, by the use of the means and instruments of interstate commerce, directly or indirectly employed devices, schemes and artifices to defraud; obtained money or property by means of untrue statements of material fact or by omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and engaged in transactions, practices, or courses of business that operated or would operate as a fraud or deceit upon the purchasers of such securities.

86.     As described above, Defendants each acted with scienter in that they knowingly or recklessly made the material misrepresentations and omissions and engaged in the fraudulent scheme identified above.

87.     Defendants each also acted negligently in making the material misrepresentations and omissions and engaging in the fraudulent scheme identified above.

88.     By reason of the foregoing, Defendants violated, and unless restrained and enjoined, are reasonably likely to continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## COUNT III

### Violations of Sections 5(a) and 5(c) of the Securities Act
### (Against All Defendants)

89.     Paragraphs 1 through 79 are realleged and incorporated by reference as though fully set forth herein.

90.     Nantomah and Investors Capital participated in an offering of securities that was never registered with the SEC, and no exemptions from the registration requirement applied to the offering.

91.     Nantomah and Global Investors Capital participated in an offering of securities that was never registered with the SEC, and no exemptions from the registration requirement applied to the offering.

92.     Nantomah and High Income Performance Partners participated in an offering of securities that was never registered with the SEC, and no exemptions from the registration requirement applied to the offering.

93.     By their conduct, Defendants directly or indirectly, (i) made use of means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement was in effect; (ii) for the purpose of sale or delivery after sale, carried or caused to be carried through the mails or in interstate commerce, by any means or instruments of transportation, securities as to which no registration statement was in effect; and (iii) made use of any means or instruments of transportation or communication in interstate commerce or other mails to offer to sell or offer to buy, through the use or medium of a prospectus or otherwise, securities as to which no registration statement had been filed.

94.     By reason of the foregoing, Defendants violated, and unless restrained and enjoined, are reasonably likely to continue to violate, Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

## COUNT IV

**Control Person Liability Under Section 20(a) of the Exchange Act for the Entity Defendants' Violations of Section 10(b) of the Exchange Act and Rule 1b-5 thereunder. (Against Nantomah)**

95.     The SEC realleges and incorporates by reference paragraphs 1 through 79 above.

96.     By virtue of the foregoing, the Entity Defendants committed violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

97.     Nantomah, at all times during the Relevant Time Period, exerted control over the activities of the Entity Defendants, including the specific activities upon which the Entity Defendants' violations are based.

98.     By reason of the foregoing, pursuant to Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)] Nantomah is liable as a control person for the Entity Defendants' violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## RELIEF REQUESTED

**WHEREFORE,** the SEC respectfully requests that this Court:

### I.

Issue findings of fact and conclusions of law that Defendants committed the violations charged and alleged herein.

### II.

Enter an Order of Permanent Injunction restraining and enjoining Defendants, their officers, agents, servants, employees, attorneys and those persons in active concert or

participation with Defendants who receive actual notice of the Order, by personal service or otherwise, and each of them from, directly or indirectly, engaging in the transactions, acts, practices or courses of business described above, or in conduct of similar purport and object, in violation of Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. § 77e(a), (c)].

**III.**

Enter an Order of Permanent Injunction restraining and enjoining Defendants, their officers, agents, servants, employees, attorneys and those persons in active concert or participation with Defendants who receive actual notice of the Order, by personal service or otherwise, and each of them from violating, directly or indirectly, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j] and Rule 10b-5 thereunder [17 CFR § 240.10b-5] by committing or engaging in specified actions or activities relevant to such violation.

**IV.**

Enter an Order of Permanent Injunction, pursuant to Sections 21(d)(1) and 21(d)(5) of the Exchange Act [15 U.S.C. §§ 78u(d)(1), (d)(5)] and Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)], permanently prohibiting Nantomah from participating, directly or indirectly— including but not limited to, through any entity owned or controlled by him—in the issuance, purchase, offer, or sale of any security, provided, however, that such injunction shall not prevent him from purchasing or selling securities for his own personal account.

**V.**

Issue an Order requiring Defendants pursuant to Sections 21(d)(5) and 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(5), (d)(7)] to disgorge the ill-gotten gains received as a result of the violations alleged in this Complaint, including prejudgment interest, with

Nantomah's liability to be joint and several with each of Investors Capital, Global Investors Capital, and High Income Performance Partners.

## VI.

With regard to the Defendants' violative acts, practices and courses of business set forth herein, issue an Order imposing upon Defendants appropriate civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

## VII.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## VIII.

Grant such other relief as this Court deems appropriate.

**JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the SEC hereby requests a

trial by jury on all claims so triable.


Dated: August 1, 2025                                    Respectfully submitted,

                                                         s/ Eric M. Phillips
                                                         Michael Foster (fostermi@sec.gov)
                                                         BeLinda Mathie (mathieb@sec.gov)
                                                         Eric Phillips (phillipse@sec.gov)
                                                         Dee O'Hair (ohaird@sec.gov)
                                                         175 West Jackson Blvd., Suite 1450
                                                         Chicago, IL 60604
                                                         Phone: (312) 353-7390
                                                         Facsimile: (312) 353-7398
                                                         *Attorneys for Plaintiff*
                                                         U.S. Securities and Exchange Commission